UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

CARLOS GOODALL,

                               Petitioner,

           -against-

TERRY BILLINGSLEY, Warden, Federal
Correctional Institution Otisville, and
THE UNITED STATES PAROLE COMMISSION,

                          Respondents.

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/17/13

11 Civ. 5603 (RA) (DF)

**REPORT AND**
**RECOMMENDATION**

**TO THE HONORABLE RONNIE ABRAMS, U.S.D.J.**:

    *Pro se* petitioner Carlos Goodall ("Petitioner") seeks a writ of habeas corpus under

28 U.S.C. § 2241, following the decision of the United States Parole Commission (the

"Commission") to deny him parole at his initial parole hearing and postpone his rehearing date

for 36 months.  (*See* Petition Challenging Decision to Deny Parole Pursuant To 28 U.S.C.

§ 2241, filed July 26, 2011 ("Pet.") (Dkt. 2).)  Petitioner is currently incarcerated at the Federal

Correctional Institution in Otisville, New York ("FCI Otisville"), where he is serving a sentence

of 15 years to life imprisonment, following his plea of guilty to one count of manslaughter while

armed and one count of carrying a pistol without a license.  (*See id.* at 1-2; Declaration of

Johanna E. Markind, Esq., dated Dec. 22, 2011 ("Markind Decl.") (Dkt. 11), Ex. A (Sentence

Monitoring Computation Data, dated Mar. 25, 2010) ("Sentence Data"), at 1-2.)

    Petitioner raises two claims in this action.  First, he claims that the Commission abused

its discretion in a number of ways, including by allegedly "double counting" the seriousness of

Petitioner's offense, by considering it at more than one stage of its parole evaluation; by

erroneously considering institutional infractions that had occurred more than three years prior to

Petitioner's parole hearing; and by improperly postponing his parole rehearing date.[1]  (*Id.* at

3-5.)  Second, Petitioner claims that these errors violated his constitutional right to due process.

(*Id.*)  For the reasons set forth below, I recommend that the Petition be dismissed.

## BACKGROUND

### A.  Factual Background

#### 1.  Criminal Offense

Petitioner's principal underlying offense was the killing of his uncle, Fabian Baker

("Baker").  (*See* Markind Decl., Ex. F (Hearing Summary, dated May 17, 2010) ("Hearing

Summary"), at 2.)  On June 14, 1995, at approximately 6:30 a.m., Baker's body was found

burned beyond recognition in a New Jersey field.  (*Id.* Ex. E (D.C. Board of Parole Guideline

Prehearing Assessment, dated Mar. 25, 2010) ("Prehearing Assessment"), at 1.)  In statements

made to the Commission, Petitioner explained that he had been involved in transporting

narcotics from New York to a distributor in Washington, D.C.  (*Id.* Ex. F (Hearing Summary,

dated May 17, 2010) ("Hearing Summary"), at 2.)  Petitioner stated that the distributor had then

provided Baker with narcotics to sell, but, according to Petitioner, Baker proceeded to use the

narcotics himself, on the assumption that Petitioner would later pay for them.  (*See id.*)

Petitioner stated that he visited Baker's house in Washington, D.C., on June 13, 1995.

(*See* Prehearing Assessment, at 1.)  According to Petitioner, he and Baker "got to arguing over

the money [Baker] owed," which "turned into a fight."  (*Id.*)  Petitioner recounted that, during

the fight, a gun he was carrying "came out" and "[i]t went off and got [Baker] on the side" of

---

[1] In his reply papers, Petitioner also argues that the Commission abused its discretion by finding that his offense involved "unusual cruelty to the victim."  (*See* Reply to Respondents' Return and Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus, dated Jan. 26, 2012 ("Reply") (Dkt. 12), at 2.)

Baker's head. (*Id.*)  Baker died from a single gunshot wound to the head. (*Id.*)  After shooting

Baker, Petitioner "tried to cover up what happened" by wrapping up the body, driving it to New

Jersey, and setting it on fire in a field. (*Id.*)

In 1996, in the District of Columbia Superior Court, Petitioner was indicted for

manslaughter while armed, and for carrying a pistol without a license. (*See* Pet., at 1-2.)

Following a plea of guilty, Petitioner was sentenced on May 4, 1998, to a term of imprisonment

of 15 years to life. (*See id.; see also* Sentence Data, at 1-2.)

### 2.     Parole History

Petitioner became eligible for parole on December 21, 2010. (*See* Sentence Data, at 3.)

On January 5, 2010, Petitioner formally applied for parole. (*See* Markind Decl., Ex. B (Notice of

Hearing Parole Application Representative and Disclosure Request, dated January 5, 2010).)  On

March 25, 2010, Petitioner appeared before Hearing Examiner Mark A. Tanner ("Tanner") for a

Prehearing Assessment. (*See* Prehearing Assessment.)  The assessment was conducted pursuant

to actuarial guidelines promulgated by the D.C. Board of Parole in 1987.[2]

Under the guidelines, Tanner determined that Petitioner had a "Salient Factor Score"

("SFS") of 7 (indicating that Petitioner presented a "[f]air" parole risk), and an "Initial Point

Assignment Grid Score" of 1 (indicating that "[p]arole should be granted with [a] high level of

supervision required"). (*Id.* at 2-4.)  Tanner, however, identified two factors that could

potentially weigh against adhering to the guidelines recommendation to grant parole. (*See id.*

---

[2] As will be described further, *infra*, these guidelines established a system of review, under which parole candidates received a point score, which then translated into a recommendation that parole either be granted or denied. *See* D.C. Mun. Regs. tit. 28, §§ 100 *et. seq.* (1987) (repealed Aug. 5, 2000).  The Commission, however, retained the discretion to make the ultimate parole determination, provided that the Commission set out its reasons for doing so in writing.

at 4.) First, Tanner determined that Petitioner would need additional programming, specifically

in anger-management and victim-empathy programs, to remain crime-free in the community.

(*See id.*; Hearing Summary, at 4.) Second, Tanner stated that Petitioner's offense, which

involved transporting Baker's body to New Jersey and setting it on fire, showed "unusual cruelty

to the victim." (Pre-Hearing Assessment, at 4.)

Petitioner appeared again before Tanner on April 27, 2010, for his parole hearing. (*See*

Hearing Summary, at 1.) In the hearing summary, dated May 17, 2010, Tanner noted that,

during Petitioner's incarceration, Petitioner had admitted to possessing marijuana in 2002 and to

threatening a chaplin with bodily harm in 2003. (*Id.* at 2-3.) Tanner, however, determined that

neither of these incidents of "serious negative institutional behavior" should factor into

Petitioner's Total Point Score because the applicable guidelines only permitted consideration of

infractions that had occurred within the prior three years. (*Id.* at 3.)

Despite determining that Petitioner had a Total Point Score of 1, which indicated that

parole should be granted, Tanner recommended that the Commission deny parole. (*Id.* at 3-4.)

In a Point Assignment Grid Worksheet accompanying the Hearing Summary, Tanner circled

four factors that militated against the grant of parole: (1) that Petitioner needed programming to

remain crime-free in the community; (2) that Petitioner's offense involved unusual cruelty to the

victim; (3) that Petitioner had engaged in serious negative institutional behavior; and (4)

"Other." (Markind Decl., D.C. Board of Parole Initial/Rehearing Parole Consideration Adult

Offenders (Point Assignment Grid) ("Point Assignment Grid") (attached to Ex. F), at 5.) Tanner

also provided the following written statement of the reasons for his recommendation:

> Your offense involved unusual cruelty to the victim which caused
> undue duress on the victim's family because you not only killed
> your uncle, you wrapped his body in a blanket and transported him

> to an adjacent State. After you found a vacant lot, you dumped his
> body and lit the body on fire causing recognition of the body to be
> very difficult. Finally, while confined in the Bureau of Prisons,
> you had two incidents of negative institutional behavior which
> involved Threatening a Chaplin with Bodily Harm and Possession
> of Drugs while confined in the institution. The Commission
> believes that additional programming is warranted to reduce your
> risk of recidivism including victim impact/empathy classes.

(Hearing Summary, at 4.) For the same reasons, Tanner recommended that the Commission

depart from the guidelines recommendation that Petitioner receive a rehearing in 12 months,

suggesting instead that the Commission postpone Petitioner's parole rehearing for 36 months.

(*Id.* at 3-4.)

By non-appealable Notice of Action dated July 2, 2010, the Commission denied

Petitioner's application for parole and postponed his rehearing for 36 months, as Tanner had

recommended.[3] (*See* Markind Decl., Ex. C (Notice of Action, dated July 2, 2010) ("Notice of

Action").) The Commission stated that Petitioner was "a more serious parole risk than shown

by" Petitioner's point score, and adopted Tanner's explanation verbatim. (*Id.*)

---

[3] Upon inquiry from this Court as to whether Petitioner's rehearing has now taken place, counsel for Respondents has informed the Court that the rehearing was held in February of this year, and that Petitioner was then granted parole, effective November 12, 2013. Petitioner, however, will apparently remain incarcerated until then, and thus, at least at this time, his Petition should not be dismissed as moot.

### B.   Procedural History

Petitioner filed his habeas Petition in this Court[4] on July 26, 2011.[5]  In his Petition,

Petitioner first argues that the Commission engaged in impermissible double-counting by

considering the "seriousness of [Petitioner's] offense" to determine his SFS and again to

determine whether parole should then be recommended.  (Pet., at 3-4.)  Second, Petitioner claims

that the Commission similarly engaged in impermissible double-counting in postponing his

rehearing (*id.* at 4), and that the 36 month postponement violated his statutory right to a

rehearing within two years (*id.* at 4-5).  Petitioner also claims that the Commission

impermissibly cited his negative institutional behavior as a factor weighing against the

guidelines recommendation that parole be granted.  (*Id.* at 5.)  Finally, Petitioner claims that the

Commission's errors, taken in the aggregate, amounted to a violation of his constitutional right

to due process.  (*Id.* at 3-5.)

On December 23, 2011, Respondents filed an opposition to the Petition.  (*See*

Respondents' Return and Memorandum of Law in Opposition to Petition For Writ Of Habeas

Corpus, dated Dec. 23, 2011 ("Resp. Mem.") (Dkt. 10).)  On January 26, 2012, Petitioner filed a

reply.  (Dkt. 12.)

---

[4] The Court has jurisdiction to decide this case, as Petitioner is currently incarcerated at FCI Otisville, which is located in this district.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement.").

[5] Although the Court's docket reflects a filing date of July 29, 2011 for the Petition (Dkt. 2), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court.  *See Houston v. Lack*, 487 U.S. 266, 270 (1988).  Thus, in the absence of evidence to the contrary, the Court will deem the Petition to have been filed on July 26, 2011, the date Petitioner signed it.  *See, e.g., Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

## DISCUSSION

I. **APPLICABLE LEGAL STANDARDS**

A. **Relevant Parole Guidelines**

At the time of Petitioner's offense in 1995, parole determinations for D.C. Code offenders, like Petitioner, were made by the District of Columbia Board of Parole (the "Board"). The Board's decisions were made pursuant to regulations adopted in 1985 and published in 1987. *See* D.C. Mun. Regs. tit. 28, §§ 100 *et. seq.* (1987) (repealed Aug. 5, 2000) (the "1987 Guidelines"). The Board clarified and expanded the 1987 Guidelines through policy statements published in 1991, 1992, and 1995.

1. **The 1987 Guidelines**

The 1987 Guidelines, as written, utilized a series of "pre and post-incarceration factors which enable[d] the Board to exercise its discretion" to determine whether parole candidates should be granted parole. D.C. Mun. Regs. tit. 28, § 204.1. Under the 1987 Guidelines, the Board would first assign parole candidates a "salient factor score (SFS)." *Id.* § 204.2. The SFS was described as an "actuarial parole prognosis aid to assess the degree of risk posed by a parolee." *Id.* § 204.3.

Relying "exclusively on information known at the time of incarceration," *Sellmon v. Reilly*, 551 F. Supp. 2d 69, 70 (D.D.C.) (internal quotation marks omitted), *reconsideration denied by* 561 F. Supp. 2d 46 (D.D.C. 2008), *aff'd sub nom. Phillips v. Fulwood*, 616 F.3d 577 (D.C. Cir. 2010), the SFS was calculated by reference to six factors: "prior convictions and adjudications, prior commitments of more than 30 days, age at commission of current offense, recent commitment-free period, status of prisoner at time of current offense, and history of heroin or opiate dependence." *Fletcher v. Reilly*, 433 F.3d 867, 871 (D.C. Cir. 2006) (citing

7

D.C. Mun. Regs. tit. 28, §§ 204.4-204.16).  For each applicable factor, the Board assigned a "numerical value" between 0 and 3.  D.C. Mun. Regs. tit. 28, § 204.4, App. 2-1, at 2-31.  The sum of these values was the SFS.  *Id.*

The SFS placed each parole candidate into a "risk category."  D.C. Mun. Regs. tit. 28, § 204.17 (10-9 = low risk; 8-6 = fair risk; 5-4 = moderate risk; 3-0 = high risk).  This risk category was converted into a "baseline point assignment."  *Id.* App. 2-1, at 2-32 to 2-34 (3 = high risk; 2 = moderate risk; 1 = fair risk; 0 = low risk).  The Board then adjusted the baseline point assignment by considering one additional pre-incarceration factor (adding one point if the parole candidate's offense involved violence, weapons, or drug trafficking), and two post-incarceration factors (adding one point for negative institutional behavior, and subtracting one point if the parole candidate had demonstrated sustained achievement in prison programs).  *Id.* at 2-34.  The adjusted baseline point assignment was called the "Point Assignment Grid Score" or "Total Point Score."  If the Total Point Score was between 0 and 2, then the guidelines indicated that parole was to be granted, with varying levels of supervision.  *Id.* (stating that, in such event, "[p]arole shall be granted at [the] initial hearing").  If the Total Point Score was between 3 and 5, then the guidelines indicated that parole was to be denied.  *Id.* (stating that, in such a circumstance, "[p]arole shall be denied at [the] initial hearing").

Despite this actuarial system, the 1987 Guidelines provided that the Board could "waive the SFS and the pre and post incarceration factors . . . to grant or deny parole."  *Id.* § 204.22.  To do so, the Board was required to "specify in writing those factors which it used to depart" from the guidelines.  *Id.* (stating that the Board "shall specify" such factors).  An appendix to the 1987 Guidelines listed six pre-incarceration factors that demonstrated that the parole candidate was "a greater risk for parole than reflected by his or her total point score," including that the offense

8

involved "unusual cruelty to victims." *Sellmon*, 551 F. Supp. 2d at 71 (quoting D.C. Mun. Regs. tit. 28, App. 2-1, at 2-34 to 2-35). Although the 1987 Guidelines stated that such departures should only be made in "unusual circumstances," D.C. Mun. Regs. tit. 28, § 204.22, courts have noted that, in practice, "the D.C. Board exercised its discretion with some frequency to deny parole to prisoners deemed suitable by the 1987 Regulations." *Taylor v. Craig*, No. 5:05-cv-00781, 2009 WL 900048, at *9 (S.D.W. Va. Mar. 24, 2009) (citing *Sellmon*, 551 F. Supp. 2d at 89-91); *see also Simmons v. Shearin*, 295 F. Supp. 2d 599, 602 (D. Md. 2003) ("[T]he 1987 guidelines simply formalized the method by which [the Board] exercised its considerable discretion to grant parole."); *Ellis v. Dist. of Columbia*, 84 F.3d 1413, 1415 (D.C. Cir. 1996) ("[Under the statutory law of parole in D.C.,] even if a prisoner established everything the statute required, the Board of Parole still had discretion to deny parole.").

Upon a denial of parole, the 1987 Guidelines specified that a rehearing date was "ordinarily" to be scheduled within "a set number of months depending on the type of offense committed and the number of years remaining in the maximum sentence." *Brown v. U.S. Parole Comm'n*, No. 02 Civ. 7639 (NRB), 2003 WL 194206, at *4 (S.D.N.Y. Jan. 28, 2003) (citing D.C. Mun. Regs. tit. 28 §§ 104.6-104.9). The Board, however, could depart from this recommendation and "order a parole reconsideration date it determine[d] to be appropriate." *See Brown*, 2003 WL 194206 at *4 (citing D.C. Mun. Regs. tit. 28 § 104.11) ("Thus, the regulations only suggest a time when a parole reconsideration hearing should take place and do not mandate that the rehearing be held in a certain number of months.").

### 2.    The 1991 Policy Statement

The Board published three policy statements clarifying and expanding the 1987 Guidelines. The first such statement was adopted on December 16, 1991. Drafted to "facilitate

consistency in Guideline application," the statement "define[d] criteria and parameters"

appearing in the 1987 Guidelines. (Markind Decl., Ex. D (Policy Guideline, dated Dec. 16,

1991) ("1991 Policy Statement"), at § II.)

First, the 1991 Policy Statement defined "negative institutional behavior" for purposes of

calculating the Total Point Score. (*See id.* at § VI(A)(1)(a).)  In initial parole cases, this term

meant (1) one Class I Offense for murder, manslaughter, kidnapping, armed robbery, or first

degree burglary at any time during the minimum sentence; (2) one Class I Offense during the

12 months preceding the hearing or during the last half of the minimum sentence up to a period

of three years, whichever was longer; or (3) two Class II Offenses during this same time frame.

(*Id.* (citing D.C. Mun. Regs. tit. 28, §§ 502-03).)

Second, the 1991 Policy Statement defined and expanded the factors that would support a

departure from the 1987 Guidelines. "Unusual cruelty to victims" was defined to include

offenses that either involved "physical, mental or emotional abuse beyond the degree needed to

sustain a conviction" or that involved "[e]specially vulnerable victims." (*Id.* at § VI(C)(6).)  The

1991 Policy Statement also added an additional factor, "Repeated or Extremely Serious Negative

Institutional Behavior," to support a departure from the 1987 Guidelines. (*Id.* at § VI(C)(7).)  In

initial parole cases, this term was defined to include:  "(1) [o]ne or more Class I offenses for

murder, manslaughter, kidnapping, armed robbery, or first degree burglary at any time during the

minimum sentence;" "(2) [t]wo or more Class I Offenses . . . during the 12 months preceding the

hearing OR during the last half of the minimum sentence up to a period of three years,

whichever is longer;" "(3) [o]ne Class I Offense plus two Class II Offenses" during this same

time frame; "(4) [t]hree or more Class II Offenses" during this same time frame; "(5) [o]pen

charge(s) for new crime(s) committed during this sentence;" or "(6) [n]ew conviction(s) for crime(s) committed during this sentence." (*Id.* at § VI(C)(7)(a) (internal citations omitted).)

### 3.     The 1992 Policy Statement

On April 27, 1992, the Board adopted a second policy statement, this time addressing "parole reconsideration dates." (*See* Gov't of the District of Columbia, Board of Parole, Policy Guideline, Definitions of Terms Used in Parole Guidelines, dated Apr. 27, 1992 ("1992 Policy Statement"), at § II, *available at* http://www.justice.gov/uspc/documents/parole-policy-guidelines.pdf.) Drafted to "eliminate any interpretation that the Board [was] restricted to using the specific aggravating and mitigating factors listed" in the 1987 Guidelines (Letter from Erias A. Hyman, Chairman of the D.C. Board of Parole, to Carol Pavileck Getty, Chair of the United States Parole Commission, dated May 7, 1992, *available at* http://www.justice.gov/uspc/documents/parole-policy-guidelines.pdf), the 1992 Policy Statement replaced the 1991 Policy Statement to the extent it had addressed reconsideration hearings. *See Sellmon*, 561 F. Supp. 2d at 52 (noting that the 1992 Policy Statement had "*no* relevance to the actual parole decisions").

Under the 1992 Policy Statement, the Board could, "in its discretion," schedule a rehearing date later than the date prescribed in the 1987 Guidelines. (1992 Policy Statement, at § VI(A)(2).) The 1992 Policy Statement provided a non-exhaustive list of aggravating factors justifying such a departure, including that the "instant offense involved unusual cruelty to victim(s)" and that the parole candidate had engaged in "repeated or extremely serious negative institutional behavior." (*Id.* at § VI(A)(2)(f), (g).) The 1992 Policy Statement did not define "repeated or extremely serious negative institutional behavior." (*Id.* at § VI(A)(2)(g).)

11

4.     **The 1995 Policy Statement**

On October 23, 1995, the Board adopted its final statement that defined terms appearing in the 1987 Guidelines. (*See* Gov't of the District of Columbia, Board of Parole, Policy Guideline, Definitions of Terms Used in Parole Guidelines, dated Oct. 23, 1995 ("1995 Policy Statement").) The 1995 Policy Statement, which superseded the 1991 Policy Statement, revised the factors that would support a departure from the 1987 Guidelines. (*See id.* at § VI.) Noting that the statement was "not intended in any way to restrict the Board's discretion," the 1995 Policy Statement confirmed the definition of "unusual cruelty to victims" as applying to offenses that involved "physical, mental, or emotional abuse beyond the degree needed to sustain a conviction on the instant offense" or that involved "especially vulnerable victims." (*Id.* at §§ V, VI(B)(5).) Rather than reference "Repeated or Extremely Serious Negative Institutional Behavior," the 1995 Policy Statement spoke only of "Serious Negative Institutional Behavior," which was defined as "documented criminal conduct or breach of institutional rules, the severity, frequency, or recent occurrence of which indicates that subject is not ready to remain crime-free in the community." (*Id.* at § VI(B)(6).) Unlike the 1991 Policy Statement, which provided a three-year limitation period, the 1995 Policy Statement allowed for the consideration of infractions that had occurred at any time during incarceration. (*See id.*)

B.     **The 1997 Replacement of the Board by the Commission**

On August 5, 1997, Congress passed the National Capital Revitalization and Self-Government Improvement Act. *See* Pub. L. No. 105-33, § 11231, 111 Stat. 712, 745-46 (codified at D.C. Code § 24-131). The Act abolished the Board and tasked the Commission with responsibility for making parole determinations "pursuant to the parole laws and regulations of the District of Columbia." *See id.* § 11231(c). The Commission assumed this new responsibility

12

effective August 5, 1998 and began revising the regulations governing parole determinations. *See id.* § 11231(a); *see also Sellmon*, 551 F. Supp. 2d at 72.

In 2000, the Commission promulgated new parole regulations, but provided that parole candidates could "receive a parole determination using the 1987 guidelines of the former District of Columbia Board of Parole" if they satisfied four criteria. 28 C.F.R. § 2.80(o)(1). Specifically, the Commission was still permitted to render a parole determination under the 1987 Guidelines if the candidate: (1) committed his offense between March 4, 1985 and August 4, 1998; (2) was not incarcerated as a parole violator; (3) received an initial hearing after August 4, 1998; and (4) did not have a parole effective date or a presumption parole date before January 1, 2010. *Id.* § 2.80(o)(2).

Then, in 2009, in response to a judicial decision holding that the Commission should simply evaluate the applications of parole candidates under the guidelines and policies in force at the time of the candidate's offense, *see Sellmon*, 551 F. Supp. 2d at 84-91, the Commission adopted this position, as well, *see* 28 C.F.R. § 2.80(o)(4) (stating that "[t]he Commission shall use the former Board's policy guidelines in making its determinations under this paragraph, according to the policy guideline in effect at the time of the prisoner's offense" (enacted Nov. 13, 2009, in response to *Sellmon*)); *see also Bailey v. Fulwood*, No. 3:CV-11-435, 2012 WL 5928302, at *3 (M.D. Pa. Nov. 26, 2012) ("Under *Sellmon*, the parole review guidelines established by the District of Columbia Parole Board and which were in place at the time D.C. offenders . . . committed their crimes must be applied.").

13

### C.   **Habeas Review**

Under 28 U.S.C. § 2241, "[t]he writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody under or by color of the authority of the United States or . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(1), (3).  Petitions filed under Section 2241 generally challenge "the execution of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions. *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001).[6]

On a habeas petition challenging a denial of parole by the Commission (or the Board, prior to the Commission's assumption of that responsibility), "the court does not review the merits of the [Commission's or the] Board's decision, but only 'whether the petitioner has been deprived of his . . . legal rights by the manner in which the revocation hearing was conducted,' in order to determine whether there has been an abuse of discretion." *Hall v. Henderson*, 672 A.2d 1047, 1055 (D.C. 1996) (quoting *Bennett v. Ridley*, 633 A.2d 824, 826 (D.C. 1993)); *see also Bialkin v. Baer*, 719 F.2d 590, 593 (2d Cir. 1983) ("The appropriate standard for review of the commission's decisions is whether there has been an abuse of discretion.").

An abuse of discretion may be found "only where there is no rational basis in the record" for the parole determination in question. *Green v. Schult*, No. 9:08-CV-00659 (GLS), 2010 WL 2925729, at *3 (N.D.N.Y. July 20, 2010) (citing *Bialkin*, 719 F.2d at 593).  As long as the record

---

[6] Such petitions are not subject to the Antiterrorism and Effective Death Penalty Act's restrictive "gatekeeping requirements." *James v. Walsh*, 308 F.3d 162, 167 (2d Cir. 2002) ("Section 2241 contains no . . . exhaustion requirement."); *see also Anderson-El v. U.S. Parole Comm'n*, No. 05 Civ. 2697 (JSR), 2006 WL 2604723, at *2 (S.D.N.Y. Sept. 11, 2006) (As the "general habeas corpus enabling statute[,] . . . [t]here is no limitations period applicable to § 2241.").

contains "some evidence" supporting the Commission's determination, "the decision should be affirmed." *Lewis v. U.S. Parole Comm'n*, No. 9:02-cv-1601 (GLS/RFT), 2007 WL 925715, at *3 (N.D.N.Y. Mar. 27, 2007) (quoting *Hinojosa v. Willingham*, No. 3:06CV329 (WIG), 2006 WL 3885224, at *1 (D. Conn. Nov. 1, 2006)). Moreover, when construing the record, the Court is obligated to defer to the Commission's factual determinations. *See Brown*, 2003 WL 194206, at *2 n.5 ("[W]e defer to the Commission's factual findings underlying its decision to deny parole and set off reconsideration."); *Hinojosa*, 2006 WL 3885224, at *1 ("[C]ourts should not judge the credibility of the evidence relied upon by the Commission.").

II.   **PETITIONER'S CLAIMS**

As Petitioner's crime was committed in 1995, the Commission appropriately evaluated his application under the 1987 Guidelines, which were in effect at that time. (*See* Prehearing Assessment, at 1 ("[T]he 1987 DC guidelines are being utilized during this hearing."); Hearing Summary, at 1 (determination made "using the *Sellmon* 1987 DC Board of Parole guidelines"); Notice of Action (determination made "under the 1987 Board guidelines for D.C. Code offenders").) Also then in effect, and hence applicable, were the 1991 and 1992 Policy Statements, although the 1995 Policy Statement was adopted thereafter, and was therefore inapplicable.

A.   **Petitioner's Abuse-of-Discretion Claim**

Petitioner claims that the Commission abused its discretion by impermissibly "double counting" the seriousness of his offense by using it first to calculate his SFS and again as a factor weighing against the resulting guidelines recommendation that parole be granted. (*See* Pet., at 3-4.) Petitioner further claims that the Commission abused its discretion both by considering his institutional infractions in deciding to depart from the guidelines recommendations and by

15

finding that Petitioner's offense involved unusual cruelty to the victim. (*See* Pet., at 5; Reply, at 2-4.) Finally, Petitioner claims that the Commission abused its discretion when it postponed his rehearing date for more than 24 months. (*See* Pet., at 4.)

### 1.   **Petitioner's Allegations of "Double Counting"**

Petitioner claims that the Commission engaged in impermissible double-counting by using the "seriousness of [Petitioner's] offense" first in the process of determining his Total Point Score and again as a stated reason for departing from the 1987 Guidelines recommendation that parole be granted.

The Commission engages in double-counting, which is an abuse of discretion, when it "relies upon an aggravating factor to generate a presumptive parole date for a prisoner . . . and then applies the same factor in determining whether to extend the date beyond the presumptive date set out under the guidelines." *Mason v. U.S. Parole Comm'n*, 768 A.2d 591, 592 (D.C. 2001) (quoting *Hall*, 672 A.2d at 1055).  When a petitioner asserts that the Commission double counted the violent aspect of his offense, it is insufficient for the petitioner merely to show that "'violence,' in the abstract, was considered twice," rather, when a petitioner raises such an issue, he must establish that the "specific episodes of violence used to justify a departure were also taken into account within the guidelines." *Id.*; *see also Taquee v. U.S. Parole Comm'n*, 110 F. App'x 130, 131 (D.C. Cir. 2004) ("The [Commission] may weigh the particular nature of an offense as an aggravating factor even if the offense itself was accounted for in determining the salient factor score." (internal quotation marks and citations omitted)); *Smith v. U.S. Parole Comm'n*, No. Civ.A. 7:05CV00120, 2005 WL 1594452, at *2 (W.D. Va. June 29, 2005) (Total Point Score determination that an offense was "violent" does "not account for the nature or degree of violence actually involved"). "The Commission does not engage in double counting

16

when departure is "based on aggravating circumstances which [the Commission] fe[els] ha[ve] *not been adequately taken into consideration by [the petitioner's] Grid Score." Brown,* 2003 WL 194206, at *5 (emphasis in original).

Here, the record shows that the Commission departed from the guidelines recommendation because it felt that Petitioner was "a more serious parole risk than shown by [Petitioner's] point score." (Notice of Action.)  Specifically, in deciding not to follow the point-score recomendation, the Commission noted that Petitioner had "wrapped [Baker's] body in a blanket and transported him to an adjacent State" and then "lit the body on fire causing recognition of the body to be very difficult."  (*Id.*)  As these specifics of Petitioner's offense were *not* fully reflected in Petitioner's Total Point Score, the Commission did not abuse its discretion by considering them as a factor justifying departure from the guidelines recommendation that parole be granted.

### 2.    Petitioner's Allegation That the Commission Considered Improper Factors in Denying Parole

#### a.    Negative Institutional Behavior

Petitioner next claims that the Commission abused its discretion by considering Petitioner's negative institutional behavior, which had occurred more than three years prior to Petitioner's hearing, as a countervailing factor to the guidelines recommendation that parole be granted.  (*See* Pet., at 5; Reply, at 3-4.)

Although Petitioner's institutional infractions were not considered in determining Petitioner's SFS (*see* Hearing Summary, at 2 (noting that Petitioner "was not assessed any negative points as part of his grid score because both incidents did not occur within 3 years of this hearing")), Tanner identified, and the Commission considered, Petitioner's infractions as a

17

factor weighing against the guidelines recommendation of parole (*see* Point Assignment Grid, at 5; Notice of Action).  Specifically, the Commission noted that Petitioner "had two incidents of negative institutional behavior which involved Threatening a Chaplin with Bodily Harm and Possession of Drugs." (Notice of Action.)

Petitioner correctly asserts that the infractions for which he was adjudicated should not have been considered by the Commission as a factor weighing against parole, as the infractions had not occurred within three years prior to Petitioner's initial hearing.  Although, as noted above, the 1995 Policy Statement eliminated this time limitation (*see supra*, at 12), the three-year limit still existed as of the date of Petitioner's offense.

Respondents argue that the Commission only considered Petitioner's institutional infractions as part of its determination that "additional programming is warranted to reduce [Petitioner's] risk of recidivism." (*See* Resp. Mem., at 12-13; Notice of Action.)  Regardless of whether the record could support the conclusion that the Commission considered Petitioner's infractions for such a narrow purpose, it is in any event apparent that the Commission's decision to depart from the recommendation of parole rested, at least in part, on permissible factors. Certainly, the Commission noted that Petitioner's offense involved unusual cruelty to the victim and that Petitioner would have needed additional programming to remain crime-free in the community. (*See* Point Assignment Grid, at 5.)  As these factors cited by the Commission were independently sufficient to justify departing from the recommendation of parole, Petitioner would not be entitled to a writ of habeas corpus even if the Commission erred by also considering Petitioner's institutional infractions. *See Cambrel v. Bledsoe*, No. 3:CV-08-1684, 2011 WL 3439199, at *9 (M.D. Pa. Aug. 5, 2011) ("[T]his finding does not demand the granting

18

of his habeas petition as the DC Board cited other permissible discretion-based reasons for departing from the guidelines recommending the grant of parole.").

**b.   Unusual Cruelty**

Petitioner similarly claims that the Commission abused its discretion in determinating that Petitioner's offense involved "unusual cruelty to the victim," which the Commission cited as a factor countervailing the guidelines recommendation that parole be granted.  (*See* Reply, at 2-3.)  Petitioner contends that, as his offense involved only a "single gunshot wound to the head" (*id.* at 2), the Commission could not have rationally found that the offense involved "[p]hysical, mental or emotional abuse beyond the degree needed to sustain a conviction on the instant offense" (1991 Policy Statement, at § VI(C)(6)).  Although the Court need not consider Petitioner's argument, as it was raised for the first time in his Reply, *see ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 97 n.12 (2d Cir. 2007); *Melo v. United States*, 825 F. Supp. 2d 457, 464 (S.D.N.Y. 2011), the Court notes that the argument is, in any event, without merit.

In determining whether an offense involved unusual cruelty, the Commission was plainly entitled to consider the method and manner by which the offense itself was carried out.  *See, e.g., Malede v. Wilson*, No. 2:11cv322, 2011 WL 7091509, at *2 (E.D. Va. Dec. 14, 2011) (considering that victim was shot multiple times), *report and recommendation adopted by* No. 2:11cv322, 2012 WL 215151 (E.D. Va. Jan. 24, 2012); *Sellmon*, 551 F. Supp. 2d at 79-80 (noting brutality evinced by "massive head trauma").  Petitioner presents no authority suggesting that the Commission could not have rationally considered Petitioner's shooting of Baker in the head to be "unusually cruel."  Indeed, the Commission has previously found that a *non*-lethal shot, at point-blank range, can constitute unusual cruelty to the victim.  *See Hunter v. U.S.*

19

*Parole Comm'n*, No. 1:10-CV-1594, 2011 WL 4528469, at *4 (M.D. Pa. Sept. 28, 2011); *see also Barnard v. Poteat*, 271 F. Supp. 2d 49, 51 (D.D.C. 2002) (finding unusual cruelty where parole candidate "shot two people at point-blank range, killing one of them").

In addition, in determining whether Petitioner's offense involved unusual cruelty, the Commission was permitted to consider the totality of his conduct, including the actions he took immediately following the offense. *See, e.g.*, *Smith*, 2005 WL 1594452, at *1 (departure sustained where parole candidate "attempted to drown and burn the victim" following the offense); *Mason*, 768 A.2d at 594 (beating following kidnapping constituted an "unusual pattern of violence" that "was related to the kidnapping but not subsumed by it"); *see also Cambrel*, 2011 WL 3439199, at *10 (considerations of cruelty are "unrestricted as a countervailing factor for going outside the 1987 Regulations"). The record here reveals that, immediately after shooting his uncle, Petitioner wrapped the body in a blanket, transported it from Washington, D.C., to New Jersey, and set the body on fire in a vacant field, such that the body could only be identified on the basis of dental records. (*See* Notice of Action; Prehearing Summary, at 4.) Even though this conduct may have occurred after Baker was killed, the Commission could have still relied on it to reach the rational conclusion that Petitioner's offense involved unusual physical abuse of Baker's body beyond the degree needed to sustain a conviction.

### 3.   Petitioner's Challenge to the Postponed Rehearing Date

Finally, Petitioner claims that the Commission abused its discretion by postponing his rehearing for 36 months. (*See* Pet., at 4.) In support of this claim, Petitioner largely reiterates his prior arguments – namely that, in deciding to set off his rehearing date, the Commission engaged in impermissible double-counting and improperly determined that Petitioner's offense involved unusual cruelty to the victim. (*Id.*)

20

The decision to deny parole and the decision to postpone a reconsideration hearing are "two distinct determinations." *Hall*, 672 A.2d at 1056.  As the obligation to schedule a reconsideration hearing is "independent" of the decision to grant or deny parole, even where the Commission relied on the same factors to reach both determinations, "no 'double counting' occur[s]." *Id.*; *see also Taquee*, 110 F. App'x 130, 131 ("[N]o double-counting occurs when the Commission relies on the same factor in reaching two independent determinations such as the denial of parole and extension of a rehearing date."); *Hunter*, 2011 WL 4528469, at *9. Consequently, the Commission did not abuse its discretion by citing the specifics of Petitioner's offense or his need for additional programming as factors justifying its decision both to deny parole and to postpone Petitioner's rehearing date.

Separately, Petitioner claims that he was statutorily entitled to a rehearing date not less than 24 months after his initial hearing.  (*See* Pet., at 4-5 (citing 18 U.S.C. § 4208(h)(2)).)  As Respondents correctly note, however, the United States Code provision on which Petitioner relies, 18 U.S.C. § 4201(4), is part of the federal parole law applicable to "Federal prisoner[s]," *id.*  Although, at the time of his parole hearing, Petitioner was incarcerated in a federal institution, he was a District of Columbia Code offender and thus was not a "Federal prisoner" within the meaning of the cited United States Code provision.  *See Walker v. Luther*, 830 F.2d 1208, 1209 (2d Cir. 1987) ("the Attorney General may assign D.C. Code offenders to incarceration either in federal institutions or in local D.C. prisons").  Consequently, the Commission properly exercised its authority over Petitioner, "pursuant to the parole laws and regulations of the District of Columbia."  D.C. Code § 24-131(c); *Smith v. LaManna*, C/A No. 6:06-1431-CMC-WMC, 2007 WL 904282, at *7 (D.S.C. Mar. 22, 2007) ("[T]he Revitalization Act reaffirmed the Commission's obligation to follow D.C. parole laws and rules.").  As

discussed above, the D.C. parole regulations only "*suggest* a time when a parole reconsideration hearing should take place and do not mandate that the rehearing be held in a certain number of months." *Brown*, 2003 WL 194206, at *4 (emphasis added); *see also* D.C. Mun. Regs. tit. 28 § 104.11.

### B.    Petitioner's Due-Process Claim

Petitioner makes repeated reference to his right to "due process" (*see* Pet., at 1-5), but, even liberally construed, the Petition does not raise a viable due-process claim.[7]

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979).  As the Constitution itself does not provide parole candidates with a liberty interest in parole, if such an interest is to exist, it must emanate from state laws or regulations.  State laws and regulations create a liberty interest when they use "mandatory statutory or regulatory language placing substantive limits on official discretion." *Daniel v. Fulwood*, 823 F. Supp. 2d 13, 28 (D.D.C. 2011) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462-63 (1989)), *reconsideration denied*, 893 F. Supp. 2d 42 (D.D.C. 2012).

The parole system created by the 1987 Guidelines conferred upon the Commission the "discretion to grant or deny parole," *McRae v. Hyman*, 667 A.2d 1356, 1357 (D.C. 1995), and thus it did not create a liberty interest, *see Ellis*, 84 F.3d at 1420 ("parole is never 'required after the Board determines that the necessary prerequisites exist'" (quoting *Bd. of Pardons v. Allen*, 482 U.S. 369, 376 (1987)); *Fisher v. Fulwood*, 774 F. Supp. 2d 54, 58 (D.D.C. 2011) ("It is well settled that a District of Columbia prisoner has no due-process liberty interest in parole under the

---

[7] As Petitioner is proceeding *pro se*, the Court must construe his pleadings "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

1987 regulations, because those regulations never require parole, regardless of whether a prisoner's grid score is sufficiently low to permit parole."); *Boone v. Menifee*, 387 F. Supp. 2d 338, 349 (S.D.N.Y. 2005), *report and recommendation adopted by* No. 03 Civ. 2593 (RMB) (FM), 2005 WL 2234031 (S.D.N.Y. Sept. 13, 2005). As the neither the laws nor regulations of the District of Columbia conferred a liberty interest, Petitioner's claim that the Commission's discretionary departure from these regulations deprived him of due process must fail.

## CONCLUSION

For all of the foregoing reasons, I recommend that the Petitioner's Petition for a writ of habeas corpus be DISMISSED in its entirety. "[N]o certificate of appealability is necessary" for an appeal from the denial of a petition for habeas relief brought under 28 U.S.C. § 2241. *Jennings v. Schult*, 377 F. App'x 97 (2d Cir. 2010) (Summary Order).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (adding three days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams, Thurgood Marshall United States Courthouse, 40 Foley Square, Room 2203, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Abrams. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

23

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d

Cir. 1983).

Dated:  New York, New York
        May 17, 2013

                                        Respectfully submitted,


                                        DEBRA FREEMAN
                                        United States Magistrate Judge


<u>Copies to</u>:

Hon. Ronnie Abrams, U.S.D.J.

Mr. Carlos Goodall
19497-050
F.C.I. Otisville
P.O. Box 1000
Otisville, NY 10963

Christine Schessler Poscablo, Esq.
Assistant United States Attorney
86 Chambers Street
New York, NY 10007